1
2
3
4
5
6
7
8                    UNITED STATES DISTRICT COURT
9                   CENTRAL DISTRICT OF CALIFORNIA
10

| | |
|---|---|
| JOHN DOE, | Case No.  CV 15-04089 AB (FFMx) |
| Plaintiff, | **FINDINGS OF FACT AND CONCLUSIONS OF LAW FOLLOWING BENCH TRIAL** |
| v. | |
| PRUDENTIAL INSURANCE COMPANY OF AMERICA; AME EXPLMOYEE WELFARE BENEFIT PLAN, | |
| Defendants. | |

        In this case under the Employee Retirement Income Security Act of 1974

("ERISA"), 29 U.S.C. §§ 1001, *et seq.*, Plaintiff John Doe ("Plaintiff") alleges that

Defendant Prudential Insurance Company of America ("Prudential") improperly

terminated his long term disability benefits by applying a 24-month mental illness

limitation to his claim.  Plaintiff contends that Prudential should not have applied the

mental illness limitation, and that therefore his benefits should not have been terminated.

Plaintiff seeks an order reinstating his benefits retroactively and prospectively, among

other relief.

        The parties submitted their opening and responsive trial briefs, along with the

1    administrative record and supplemental evidentiary materials.  The Court heard oral

2    argument on November 29, 2016.  The Court rules as follows.

3    **I.      SUMMARY OF DISPUTE**

4         This case turns on whether Plaintiff's long term disability ("LTD") benefits are

5    subject to the Plan's 24-month mental health limitation, which caps at 24 months LTD

6    benefits for a disability "due in whole or part to mental illness."  It is not disputed that

7    Plaintiff has problems with attention, memory, focus, and executive function that

8    prevent him from performing his job.  Nor is it disputed that Plaintiff is "disabled"

9    within the meaning of the Plan.  As such, on July 11, 2011, Prudential awarded Plaintiff

10   LTD benefits.

11        However, Prudential determined that Plaintiff's disability was caused by his

12   mental health condition, in particular, depression and anxiety that he struggled with for

13   years.  Prudential also determined that Plaintiff's physical health conditions– conditions

14   related to HIV, asthma, migraines, hypertension, bundle branch block, and osteoporosis–

15   were not disabling.  Accordingly, Prudential applied the mental health limitation and

16   terminated his benefits after 24 months.  Plaintiff argues that his disability has a

17   physiological cause – in particular, brain damage likely resulting from HIV – and that

18   therefore Prudential should not have applied the mental health limitation.

19        The doctors' reports Plaintiff submitted to support his initial claim do focus all but

20   exclusively on the debilitating psychological and cognitive effects of Plaintiff's

21   depression.  But, neuropsychological evaluations obtained thereafter show that Plaintiff

22   suffers from cognitive deficiencies that may be caused by brain damage. Thus, even if

23   the initial doctors' opinions can reasonably support only a mental health etiology,

24   subsequent reports show that there may be a physical etiology.  Resolving this issue is

25   particularly difficult because Plaintiff's disabling symptoms are cognitive problems that

26   are not physically visible, and they may have either a psychological etiology or a

27   physical etiology, or a combination of both.   In sum, the record contains evidence that

28   could arguably support a determination either way.  However, after carefully considering

1  all of the evidence, the Court finds that Plaintiff's disability was not "due in whole or
2  part to mental illness" and that Prudential should not have applied the mental illness
3  limitation.

4  **II.   LEGAL STANDARD**

5      This is an action to recover plan benefits governed by the Employee Retirement
6  Income Security Act of 1974, 29 U.S.C. § 1001, *et seq.* ("ERISA").  29 U.S.C. §
7  1132(a)(1)(B).  In the Ninth Circuit, ERISA claims for benefits are adjudicated by a
8  bench trial under Federal Rule of Civil Procedure Rule ("Rule") 52(a).  *Kearney v.*
9  *Standard Ins. Co.*, 175 F. 3d 1084, 1095 (9th Cir. 1999).  Under Rule 52(a), the court
10  can resolve factual issues in favor of either party, and it must "find the facts specially
11  and state its conclusions of law separately."  Fed. R. Civ. Proc. 52(a).

12      In a previous Order, the Court determined that it will review the record *de novo*.
13  *See* Order (Dkt. No. 57).  Under the *de novo* standard, the Court independently considers
14  the evidence, finds facts, and determines how the policy applies, just as it would resolve
15  any other breach of contract claim.  *Firestone Tire & Rubber Co. v. Bruch*, 489 U.S.
16  101, 112-113 (1989); *Krolnik v. Prudential Ins. Co. of Am.* 570 F. 3d 841, 843 (7th Cir.
17  2009) (" 'de novo review' is a misleading phrase . . . For what *Firestone* requires is not
18  'review' of any kind; it is an independent decision rather than 'review' that *Firestone*
19  contemplates . . . [The] court takes evidence (if there is a dispute about a material fact)
20  and makes an independent decision about how the language of the contract applies to
21  those facts.").

22      "In a trial on the record, the court 'can evaluate the persuasiveness of conflicting
23  testimony and decide which is more likely true.' " *Armani v. Nw. Mut. Life Ins. Co.*,
24  2014 WL 7792524, at *8 (*quoting Kearney*, 175 F.3d at 1095); s*ee also Schramm v.*
25  *CNA Fin. Corp. Insured Group Benefits Program*, 718 F. Supp. 2d 1151, 1162 (N.D.
26  Cal. 2010) (a court reviewing the administrative record "evaluates the persuasiveness of
27  each party's case, which necessarily entails making reasonable inferences where
28  appropriate").

The court may consider the administrative record, which are the materials the administrator considered in reaching its benefit determination, and "under certain circumstances [new evidence may be considered] to enable the full exercise of informed and independent judgment." *Mongeluzo v. Baxter Travenol Long Term Disability Ben. Plan*, 46 F.3d 938, 943 (9th Cir. 1995).

Plaintiff bears the burden of proof of showing, by a preponderance of the evidence, that he is entitled to the benefits provided by the Policy. *Sabatino v. Liberty Life Assurance Co. of Boston*, 286 F. Supp. 2d 1222, 1232 (N.D. Cal. 2003). In its previous Order, the Court held that Plaintiff also bears the burden of showing that the mental health illness limitation does not apply. *See* Order, pp. 8-10.

## III.  EVIDENCE BEFORE THE COURT

The Court considered the evidence in the Administrative Record ("AR").

The parties also submitted materials outside of the administrative record. Materials outside of the record can be considered " 'only when circumstances clearly establish that additional evidence is necessary to conduct an adequate de novo review of the benefit decision.' " *Mongeluzo*, 46 F.3d at 944 (citation omitted). The Court reviewed the submitted excerpts of the depositions of Drs. Jay Gladstein, Gary Cohan, Kristen Fiano, Mark Alfano, and Richard Perrillo. The deposition excerpts were somewhat enlightening on general background matters, such as the distinction between a relative impairment and an absolute impairment, and on the viability of neuropsychological testing to assess cognitive function. As to Plaintiff's specific condition, however, the excerpts were too choppy to yield useful evidence beyond what the administrative record already covered.

Plaintiff also submitted Administrative Law Judge Sally Reason's decision awarding Plaintiff Social Security Disability Insurance benefits. The Court did not find this material helpful because it is not directed towards answering the factual question here – whether Plaintiff's disability is "due in whole or part to mental illness" such that the mental health limitation should apply. The Court did not, therefore, consider the

SSDI award for any purpose.

Thus, the deposition excerpts and the social security decision are not necessary for this Court to conduct an adequate review, so the Court declines to admit them.

## IV.    FINDINGS OF FACT[1]

### A. The Plan's LTD Benefit

Prudential insures long term disability ("LTD") benefits under the WME IMG Group Welfare Benefits Wrap Plan (the "Plan") pursuant to the terms of group contract no. DG-93974-CA (the "Group Contract") Prudential issued to William Morris Endeavor Entertainment, LLC ("WME").  (AR 1865-6.)[2]

Plaintiff was covered by the Plan.

The Group Contract was amended by Certificates issued in 2009 and 2012. (AR 1877-8, 1989-90.)  However, the Group Contract provides that "an amendment will not affect a claim incurred before the date of change." (AR 1872.)  Plaintiff's claim was incurred when he was awarded benefits in 2011, so the 2009 Certificate applies to his claim and the 2012 Certificate does not.

Under the 2009 Certificate, the relevant LTD Coverage (the "2009 Certificate") became effective in 2009.  (AR 1786-1823, AR 1878.)

Under the Plan's LTD Coverage, a participant is entitled to monthly disability benefits when they are "totally disabled," which is defined as being "unable to perform with reasonable continuity the substantial and material acts necessary to pursue your usual occupation" due to "sickness or injury."  (AR 1797.)  "Substantial and material acts" means the "important tasks, functions and operations generally required by employers from those engaged in your usual occupation that cannot be reasonably omitted or modified."  (AR 1797.)

---

[1]  Any conclusion of law which is deemed a finding of fact is incorporated herein by reference.
[2]  Bates numbered citations are to the Administrative Record ("AR") filed under seal on October 21, 2016 (Dkt. No. 60).

1   The 2009 Certificate limits to 24 months LTD benefits for disabilities that "are
2   due in whole or part to ***mental illness***" ("mental illness limitation") (AR 1804-5.)

3   The 2009 Certificate defines "mental illness" as follows: "***Mental illness*** means
4   a psychiatric or psychological condition regardless of cause.  Mental illness includes
5   but is not limited to schizophrenia, depression, manic depressive or bipolar illness,
6   anxiety, somatization, substance related disorders and/or adjustment disorders or other
7   conditions.  These conditions are usually treated by a mental health provider or other
8   qualified provider using psychotherapy, psychotropic drugs, or other similar methods
9   of treatment as standardly accepted in the practice of medicine." (AR 1805, emphasis
10  in original.)

11  The 2009 Certificate provides that the mental illness limitation will not apply
12  "to dementia if it is a result of . . . viral infection." (AR 1805.)

13  Coverage under the Policy ends when a claimant is no longer a full-time
14  employee, and is therefore no longer a member of a covered class.  (AR 1788, 1794.)

15  **B. Plaintiff's Employment History**

16  Plaintiff worked at the talent agency William Morris Agency from November
17  1992 to May 2009 and, after a merger, at WME from June 2009 to May 2011.  At the
18  time he left WME, Plaintiff was employed as Head of Commercial Division. (AR
19  1297.)  In that position, Plaintiff managed approximately 30 people and ran his own
20  department as a talent agent.  His job included "coupling high profile artists to brands
21  and handling and managing talent." (AR 918.)

22  The Department of Labor characterizes a talent agent as a demanding
23  profession that requires superior cognitive abilities.  A talent agent confers with
24  clients to develop career strategies, develops contacts with others who can advance the
25  clients' careers and provide information about business opportunities, promotes clients
26  to those who might hire them, negotiates contracts for clients, and manages clients'
27  business affairs.  (AR 172-191.)

28

1    The ability to process, remember, and act on these exchanges in an

2    unstructured, highly-competitive, and time-sensitive work context is essential to

3    successfully performing the job.  (AR 183-84.)

4    These activities require the ability to perform certain cognitive abilities at a

5    very high level, including excellent oral comprehension and expression, high problem

6    sensitivity (i.e., the ability to identify problems and solve them), and excellent written

7    comprehension and expression.  (AR 177-78.)

8    Consistent with advice from his doctors, Plaintiff took a leave of absence from

9    work starting on April 25, 2011.  (AR 1159.)

10   **C. Plaintiff's Initial LTD Claim and Supporting Doctors' Opinions**

11   On April 12, 2011, Plaintiff filed a claim for LTD benefits.  (AR 1473-1482.)

12   Plaintiff stated that he was "unable to work as a result of HIV infections, HIV related

13   pain and fatigue, and related medical conditions including osteoporosis and severe

14   depression." (AR 1482.)  In response to the question "How does this condition

15   interfere with your ability to perform your job?" Plaintiff stated: "My HIV infection,

16   pain, fatigue, osteoporosis, and severe depression cause pain and fatigue and severely

17   disrupt my ability to sustain my focus and concentration for significant periods of

18   time.  Due to my inability to sustain focus and concentration, I am unable to perform

19   the essential tasks of my job on a persistent and reliable basis."  (AR 1482.)

20   Thereafter, Plaintiff submitted Attending Physician Statements ("APS") from

21   three doctors in support of his claim.  All of the doctors stated that Plaintiff was

22   disabled due to mental health issues including depression and anxiety.

23   First, Plaintiff's psychiatrist, Dr. Harvey Sternbach, submitted an APS dated

24   April 25, 2011, listing Plaintiff's primary diagnosis as major depressive affective

25   disorder and secondary diagnoses as dsythymic disorder (persistent depressive

26   disorder) and anxiety disorder.  Dr. Sternbach noted that "[a]t present, [Plaintiff] is not

27   functional and needs inpatient care."  (AR 1396, 1399.)

28

7.

Second, Plaintiff's psychotherapist for about twelve years, Dr. Lauren Wittlin, submitted an APS dated May 5, 2011, stating that Plaintiff was "suffering from major depression [and] anxiety, [and] require[d] increased care."  When asked the nature of Plaintiff's medical impairment, Dr. Wittlin identified "major depression, anxiety, suicidal ideation."  (AR 1400-1.)

Third, Plaintiff's internist, Dr. Jay Gladstein, an HIV specialist, submitted an APS dated May 5, 2011, reporting that Plaintiff's "[r]eturn to work plan [is] under management by [patient's] psychiatrist, Dr. Sternbach" and that "intractable depression may pose an obstacle."  Dr. Gladstein concluded that Plaintiff's primary diagnosis was major depressive affective disorder (ICD-9 code 311), and stated that Plaintiff had secondary diagnoses of HIV (ICD-9 code 042) and bundle branch block (ICD-9 code 426.50).  (AR 1398.)   Regarding Plaintiff's medical impairment, Dr. Gladstein identified "loss of concentration [and] severe depression."  (AR 1398.)

In a summary letter dated May 27, 2011, Dr. Sternbach reported that he had treated Plaintiff since September 29, 1997 for depression and anxiety.  Dr. Sternbach stated that over the years Plaintiff had "been prescribed many antidepressant regimens," and that despite numerous trials of medication in conjunction with psychotherapy, Plaintiff "became increasingly depressed, [and] found it more difficult to work, socialize and generally function."  Dr. Sternbach stated that he and Plaintiff's psychotherapist, Dr. Wittlin, had recommended inpatient psychiatric treatment.  Dr. Sternbach concluded that Plaintiff could no longer work and advised him to take a leave of absence, which Plaintiff did as of April 25, 2011.  (AR 1159.)

**D. Prudential Determines that Plaintiff is Disabled and Awards Benefits**

On June 21, 2011, Prudential employee Mashelle Krier, RN, reviewed Plaintiff's medical records and concluded that "[b]ased on the Psychiatrist's APS statement and his summary of treatment notes, it [was] reasonable at this time, to support that the [Plaintiff] would have had a reduction in functional capacity related to his behavioral health ['BH'] status."  Regarding Plaintiff's physical conditions, Nurse

Krier concluded that the medical evidence did not support any functional impairment. She also stated that Plaintiff's medical providers (infectious disease, endocrinology, psychotherapy) all had concluded that Plaintiff experienced psychiatric impairment. Nurse Krier thus concluded that "[i]t would be reasonable to support a decrease in functional capacity from a BH perspective" through August 2011.  (AR 1716.)

On July 8, 2011, Prudential approved Plaintiff's claim for LTD benefits beginning July 11, 2011 through August 31, 2011 based on his behavioral health conditions related to his depression and anxiety, but determined that his conditions related to HIV, asthma, ocular migraines, hypertension, bundle branch block and osteoporosis were not disabling.  Prudential also advised Plaintiff of the 24-month mental illness limitation. (AR 1600-2.)

### E. Plaintiff's Ongoing Medical Evaluations

Thereafter, Prudential continued to review Plaintiff's claim.  Additional treatment reports were submitted.  These reports tended to substantiate the mental health basis of Plaintiff's disability.  For example, psychotherapist Dr. Wittlin's treatment summary and notes through August 11, 2011 stated that Plaintiff felt "depressed his whole life" and that this "grew to a major depression disorder" and she diagnosed him with "major depression, recurrent, severe without psychotic symptoms" and "anxiety disorder NOS."  She concluded that Plaintiff "must stay active in his life although he feels hopeless and often feels immobilized." (AR 1236-37.)  In early 2011 Plaintiff was "contemplating leaving WME due to mental health issues," but making that decision was "very stressful and anxiety producing" because although he felt "that he need[ed] to leave for his own health [he] [was] scared of leaving and not knowing what he [would] do next."  Dr. Wittlin concluded that Plaintiff's inability to make a decision was "de-stabilizing."  She also stated that after a month and a half of internal struggle, Plaintiff set a deadline to make a decision about staying or leaving WME by April 1, 2011. (AR 1241.)

On April 4, 2011, Plaintiff reported that he gave notice at work, but this caused him extreme anxiety and on May 1, 2011, Wittlin stated that Plaintiff had a "total psychic disintegration," and was disoriented and suicidal due to the "impact of the loss of his career," which sent him into "a downward spin." (AR 1242-8.)

After a February 1, 2012 visit, Dr. Gladstein stated that Plaintiff's cognitive function was "normal," that Plaintiff's bundle branch block was "asymptomatic from cardiac standpoint," his hypertension was "controlled," and his depressive disorder was being followed by Dr. Sternbach and glaucoma was being followed by Dr. Fox. (AR 757-8.)

On April 13, 2012, Dr. Sternbach wrote a summary letter stating "[d]ue to the severity of [Plaintiff's] depression, it was necessary to have him leave the workplace as of April 25, 2011. [Plaintiff] became more withdrawn, suicidal, hopeless and overwhelmed. I have recommended inpatient treatment and consideration of Electroconvulsive Treatment (ECT), Transcranial Magnetic Stimulation . . . and Vagal Nerve Stimulation as options . . ." (AR 977.)

On May 28, 2012, independent physician reviewer, Dr. Omowunmi Osinubi, M.D., board certified in anesthesiology and occupational medicine, reviewed Plaintiff's medical records. Dr. Osinubi concluded Plaintiff's "reported physical conditions as co-morbid factors . . . that preclude [Plaintiff] from working are simply not supported by the medical records." Plaintiff reported that he was unable to work as a talent agent due to memory problems and cognitive difficulties, but Dr. Osinubi stated that there was "no neuropsych evaluation in any of the medical records submitted for review" or mental status exams. She noted that Dr. Gladstein's office visit notes stated that cognitive function was "normal." Dr. Osinubi recommended neuropsychological testing due to the "inconsistencies" noted in Plaintiff's clinical presentation from provider to provider and to better assess his capacity from a behavior health standpoint. Dr. Osinubi concluded that "the review of [medical records] provide[d] support that this claim is primarily a behavioral health claim.

Functional impairment (if any) is attributable only to BH, and not to any one or a combination of the physical medical conditions so stated." (AR 1693-4.)

### F. Dr. Alfano's July 2012 Neuropsychological Evaluation Finds Psychological Impairments but No Cognitive Impairments

In July 2012, Plaintiff underwent his first neuropsychological evaluation, an independent medical examination ("IME") conducted by Dr. Mark Alfano, Ph.D., board certified in neuropsychology. The exam included neurocognitive testing to objectively measure Plaintiff's claimed cognitive impairments. Dr. Alfano produced a report of his conclusions. (*See* Alfano Report, AR 912-931.) Alfano found that Plaintiff's "estimated premorbid IQ" was in the superior range. (AR 923.) He found that Plaintiff's "measured intellectual ability" as reflected in his "current level of intellectual functioning" was in the average range – a score below expectations compared with his estimated premorbid IQ. (AR 923.)

Plaintiff's test on various aspects of attention and processing speed yielded nearly all average to high average results; Alfano concluded that "[in] sum, attention was characterized by intact simple attention, working memory, and complex attention." (AR 924.)

Plaintiff's verbal learning and memory, and his visual learning and memory produced varied results, including borderline impaired, low average, average, and average to superior. (AR 925.) Alfano found that Plaintiff was largely intact in these areas, and attributed this wide variability in Plaintiff's test results to his emotional state during the exam. (AR 925.)

Alfano found that Plaintiff's executive functioning "was somewhat at or above expectations, with scores ranging from the average to very superior range." (AR 00926.) Looking at the eight specific aspects of executive functioning that were tested, Plaintiff scored in the average or average-to-high-average range in five aspects (working memory, complex attention in the face of interference, alternating mental set, response inhibition, and hypothesis formation); high average in one aspect (fluid

1   reasoning); high average to superior in one aspect (generation of responses); and very

2   superior in one aspect (efficient deductive reasoning).  (AR 926-927.)

3       Dr. Alfano's Report also includes his responses to specific questions posed by

4   Prudential.  (*See* AR 928-931.)  Alfano stated that there was "no evidence of

5   significant cognitive impairment at this time," and that Plaintiff's "subjective

6   complaints are quite discrepant from the findings of this evaluation."   Dr. Alfano

7   stated that Plaintiff identified "a host of cognitive difficulties, which in his perception,

8   have made it impossible for him to continue in his profession," but that the "objective

9   assessment of cognitive functioning revealed broadly intact ability in all areas

10   assessed."  Dr. Alfano further stated that Plaintiff's interview responses, as well as the

11   results of his personality testing, suggested "that his depression and anxiety [were]

12   likely leading to significant cognitive distortions regarding his cognitive abilities."

13   Dr. Alfano concluded that "this tends be a self-reinforcing phenomena, such that overt

14   focus on perceived deficits and emotional stress themselves serve as internal

15   distracters affecting attentional abilities and functional cognition."  Dr. Alfano noted

16   that Plaintiff's HIV disease was "well controlled and stable," that Plaintiff's pattern of

17   performance on the IME was "not consistent with that of an HIV-related

18   neuropsychological impairment, characterized by prominent impairments in speed of

19   information processing and psychomotor speed, as well as complex attention/working

20   memory, executive functioning, memory deficits," and that Plaintiff did not meet the

21   criteria for HIV-Associated Neurocognitive Disorder ("HAND").  (AR 929.)  Dr.

22   Alfano stated that there were "no restrictions and/or limitations from a cognitive

23   standpoint," but noted that "to the degree that [Plaintiff's] psychiatric symptoms

24   [were] impacting his functional cognition, successful treatment of anxiety and

25   depression may provide the claimant with better cognitive functioning."

26       On August 24, 2012, Dr. Alfano provided an addendum responding to

27   additional questions from Prudential relating to whether Plaintiff had

28   psychological/emotional impartments, his prognosis, and treatment of his

psychological conditions.  (*See* Addendum, AR 905-908.)  Alfano responded that Plaintiff had "psychological/emotional impairment" based on Plaintiff's long history of depression and anxiety as noted in the medical records; Plaintiff's performance on the psychological tests reflecting a "severe" depressive symptoms and "moderate-severe" anxious symptoms;  and behavioral observations and Plaintiff's self-reports indicating that he experienced significant anxiety and distress during the evaluation, including the fact that Plaintiff began to cry, requiring breaks at certain points.

### G. Prudential Continues to Pay Benefits Until the 24-Month Limit is Reached

During this period, Prudential continued to find Plaintiff totally disabled, and continued to pay benefits; it also informed his counsel that the Policy's mental illness benefit limitation applied so "the initial 24 month period of disability would end as of July 10, 2013."  (AR 1551-3.)

On July 9, 2013, Prudential informed Plaintiff's counsel that benefits would not be paid beyond the 24-month mental illness period. Prudential explained that the medical records contained in the claim file, in addition to the various reports received, did not support a physical condition that limited Plaintiff from his occupation or required medically necessary restrictions in the performance of that profession. Additionally, there was no evidence of a significant cognitive impairment or any neurological contribution to Plaintiff's perceived cognitive deficits.  (AR 1539-46.)

Thereafter, Plaintiff twice appealed Prudential's decision to terminate his benefits.  He argued that his "declining mental health and cognitive performance ha[d] been caused by his HIV disease and co-morbid conditions" and "ultimately ha[d] a physical etiology."  (AR 580.)   Prudential upheld its decision, most recently on January 23, 2015.  (AR 1485-97.)

1      **H. Additional Medical Evidence Generated After Plaintiff's Claim was**
2         **Terminated**

3         During the appeals process, additional evidence concerning Plaintiff's condition
4    was generated: (1) an August 6, 2013 report by Dr. Gary Cohan (AR 214-216); (2) a
5    June 2014 neuropsychological exam and an October 7, 2014 report by Dr. Richard
6    Perrillo, PhD (AR 132-164); and (3) a December 8, 2014  report entitled
7    "Neuropsychological File Review" by Dr. Kristin Fiano (AR 12-30).

8              **1.  Dr.  Cohan's Findings**

9         Dr. Cohan, an HIV specialist, has been Plaintiff's treating physician since May
10   2012; he provided a letter dated August 6, 2013, in response to Prudential's
11   termination of Plaintiff's claim.  (AR 214-216.)  Dr. Cohan stated that Plaintiff is
12   disabled by multiple factors directly related to his HIV infection, including chronic
13   fatigue and cognitive dysfunction, and that this is exacerbated by other factors such as
14   lumbar disc disease and radiculopathy.  (AR 215.)

15        Dr. Cohan stated that Plaintiff's cognitive functioning is impaired such that he
16   cannot sustain his focus and concentration over an eight hour day, and that "his
17   problems in this regard are caused and contributed to by his HIV disease, fatigue,
18   chronic pain and nausea."  (AR 592.)  Cohan also stated that "persons exposed to HIV
19   for a long period of time suffer from declining cognitive function as they age."  (AR
20   593.)  He noted that "[r]ecent scientific studies have demonstrated that HIV positive
21   individuals can experience cognitive deficits even when the viral load is completely
22   undetectable [and] that [Plaintiff] suffers from this type of gradual cognitive decline
23   often seen in aging HIV patients."  (AR 593.)

24        Dr. Cohan stated that his findings are supported by objective laboratory data
25   (showing detectable HIV viral loads) and MRI imaging.  (AR 215.)  However, the
26   record does not include any MRI imaging, so it is not clear what he was referring to.

27

28

### 2. Dr. Perrillo's June 2014 Neuropsychological Evaluation Finds that Plaintiff Has Suffered Cognitive Decline Attributable to Brain Damage Caused by HIV Disease

In June 2014, Plaintiff underwent a second neuropsychological evaluation. This evaluation was conducted by Dr. Perrillo and included two days of comprehensive neuropsychological and psychological testing conducted by Perrillo, and Perrillo's review of Dr. Alfano's 2012 test, including Alfano's raw data and report.  (*See* Perrillo Report 132-165.)  Dr. Perrillo reported that both Alfano's 2012 tests and his 2014 tests showed that Plaintiff's "neuropsychological results are globally *moderately abnormal* with major changes noted from his estimated consolidated (premorbid) predicted abilities."  (AR 143 (original emphasis).)  Notably, Plaintiff's IQ tested 9 points lower than expected because of a loss of verbal comprehension and cognitive proficiency, and he had "more alarmingly deficient" loss in "combined auditory and visual Immediate Memory."  (AR 143.)   Perrillo thus concluded that Plaintiff suffered from moderate organic brain dysfunction that would be expected to cause moderate interference with occupational, social, and interpersonal functioning.  (AR 142-143.)

The 2012 test and the 2014 test were both considered valid in that both included embedded validity testing that Plaintiff passed (AR 27); for the 2014 test, Plaintiff gave optimal effort and was not malingering or manipulating his test performance.  (AR 142, 156.)

In brief summary, Perrillo stated that the 2012 and the 2014 tests established that Plaintiff had a baseline cognitive performance level in the "superior/very superior" category, with a high IQ in the 120-125 range, so that his expected performance in any particular test would be in the 91% to 95% range.  (AR 139.)  However, on the 2014 test, Plaintiff consistently performed below his expected performance.  As noted, he evidenced a nine-point drop from his expected IQ.  (AR 143.)  On fifteen of the cognitive tests, Plaintiff's scores fell in the 15th percentile overall, and on eight tests he fell below the 5th percentile, which is very poor for

someone with an expected high-average to superior level of baseline cognitive ability. (AR 145.)   For example, the data showed that Plaintiff's attention was "profoundly impaired" and well below his expected performance.  (AR 146.)  Plaintiff's executive functioning, which includes advanced cognitive functions such as the ability to self-monitor and perceive the intentions of others, the ability to synthesize information, abstract reasoning ability, and the ability to improvise, showed significant impairments.  (AR 152-153.)

Plaintiff also has specific short-term memory impairments.  For example, Plaintiff tested as absolutely impaired on "single-trial" learning, which measures a person's ability to remember information when only given one opportunity to learn it. (AR 154.)   He also showed absolute impairment – performing in the first percentile – on immediate recall of auditory and visual information, that is, he has great difficulty recalling information he has just received and although he does better when he has time to think about it he still performs well below expectations.  (AR 154.)

Dr. Perrillo stated that Plaintiff is completely disabled and that "he would be unable to compete and be productively employed at or near his previous capacity level or in new learning environments."  (AR 158.)  Importantly, Dr. Perrillo stated that "[r]esearch has clearly shown that depression and anxiety do not have significant effects on neuropsychological test results," and he explicitly ruled out depression itself as an explanation of Plaintiff's cognitive testing results.  (AR 157-158.)  He expressly notes that Plaintiff has had major depression for a long time but was certainly able to function; however, since 2011, Plaintiff has reported "numerous physical, sensory, cognitive changes."  (AR 142.)

Perrillo's main diagnosis is that Plaintiff suffers from "Moderate Brain Dysfunction with significant white matter changes and selective prefrontal, fontal, temporal, occipital and motor impairments." (AR 157.)  Perrillo further found that Plaintiff's "abnormal brain is related to and caused by protracted HIV and associated toxic treatments."  (AR 158.)

Dr. Perrillo also discounted the neuropsychological testing conducted by Dr. Alfano.  Dr. Perrillo stated that Alfano used the 1990's era WAIS-III and WMS-III tests, "which are now obsolete and outdated" and which were replaced in 2008-2009 with WAIS-IV and WMS-IV.  (AR 160.)  Perrillo stated that the outdated tests overstate an individual's capacity and that the replacement tests account for advances in neuroscience.  In addition, Perrillo argued that using outdated tests violates professional ethics, including the American Psychological Ethics Code 9.08, which states that psychologists do not rely on outdated or obsolete tests.  Because such tests are not considered reliable, a memo from the Social Security Administration advises that a test with outdated norms "will result in IQs significantly higher and will result in diagnostic misclassification."  (AR 160-161.)  As such, Perrillo opined that Dr. Alfano's report and opinions are based on unreliable tests and data, and therefore his opinions and conclusions are invalid as well.

Dr. Perrillo's report also includes references to and quotations from a number of scientific and scholarly papers supporting the position that HIV infection can cause brain damage resulting in cognitive decline.  For example, one study states that "HIV infection is known to have profound effects on both brain and behavior."  (AR 133.)  Furthermore, "[n]euroimaging studies" have found reduced cortical thickness, basal ganglia atrophy, and global reductions in write matter integrity.  "These brain changes have profound effects on cognition," and up to 52% of those with HIV experience some form of cognitive impairment.  (AR 133.)  "Commonly affected domains include motor function, executive function, attention, visual memory, and visuospatial function."  (AR 133.)  Finally, "[g]iven its prevalence, treating cognitive dysfunction has become a central goal for therapies aiming to improve outcome [sic] among individuals with HIV."  (AR 133.)

17.

### 3. Dr. Fiano Finds Evidence of Cognitive Impairments with a Neurological Basis

Dr. Fiano, a neuropsychologist, prepared her report after reviewing the doctors' reports submitted with Plaintiff's initial claim, the follow-up reports, and most importantly Dr. Alfano's 2012 report (but not the raw test data itself) and Dr. Perrillo's 2014 test data and report.  (*See* Fiano Report, AR 12-30.)  In her report, Dr. Fiano summarized the other doctors' findings and then provided her evaluation in response to specific questions Prudential asked.

As to whether Plaintiff has "any cognitive impairments from July 11, 2013 forward," (question 1) Fiano answered "Yes," and explained that Dr. Perrillo's testing "documented areas of relative impairment with some areas of absolute impairment." (AR 22.)  As to whether Plaintiff has "any medically necessary restrictions and /or limitations from any cognitive symptoms from July 11, 2013 forward" (question 2), Fiano answered "Yes . . . [Plaintiff] would be limited by the cognitive symptoms described in the previous response."  (AR 23.)  To whether Plaintiff's cognitive symptoms would restrict or limit his ability to perform general work tasks including computer work, communication, working with others, concentrating, focusing, or sustaining full-time work activity (question 3), Fiano indicated that Plaintiff had some limitations in some of these areas, but that there was no strong evidence of limitations in other areas.   (AR 24.)

As to whether Plaintiff's claimed inability to work due to the severity of his cognitive conditions is supported by the documentation (question 4), Fiano responded that the record does indicate limitation in certain areas, "but does not support a complete inability to work." (AR 25.)  Fiano stated that although "Perrillo argued that even average range scores would be considered impairments" for Plaintiff, "he did show average or better scores compared to the general population . . . indicat[ing] the capacity to perform tasks that the average individual would be capable of. . ." (AR 25.)

18.

1    As to whether there is support in the record for the argument that Plaintiff's

2    cognitive complaints are attributable to a neurological deficit linked to his HIV status

3    or from his use of HIV medications (question 5), Fiano responded "I do find support

4    for cognitive impairments given the more recent testing and that organic factors are

5    among the several potential etiologies." (AR 25.) Fiano then summarized again how

6    Plaintiff tested on various areas of cognitive performance: although Plaintiff's results

7    were not uniform, in nearly every instance his results were average or below average–

8    results that are below expectations given Plaintiff's superior baselines, and that

9    therefore reflect cognitive impairment. (AR 26.) Fiano also stated that "[t]here is

10   evidence for a cognitive disorder with at least some component being related to

11   neurological or organic factors . . . [including] his HIV status, associated treatment,

12   and other conditions that would impact the integrity of white matter and the vascular

13   system." Fiano was "less convinced" that Plaintiff had HIV dementia because the

14   variability of his scores is atypical of a person with dementia, and she stated there is

15   "continued additional influence from psychological factors . . . that would be expected

16   to exacerbate any organically based deficits." (AR 26.)

17       Commenting on the validity of the neuropsychological testing performed by Dr.

18   Perrillo (question 6), Fiano stated that the test had two stand-alone validity measures

19   and "numerous embedded validity measures across functional domains" and Plaintiff

20   passed them all. (AR 27.)

21       Commenting on Dr. Perrillo's findings (question 7), Dr. Fiano she stated that

22   she agrees that Plaintiff "has some genuine cognitive weaknesses," but she finds

23   Perrillo's conclusions "overstated" and "overly focused on one etiology" instead of

24   considering other factors influencing Plaintiff's score and his reported functioning.

25   (AR 27.) While Fiano concurred with Perrillo's statement that mood or psychological

26   factors do not ordinarily play a role in neuropsychological testing, she stated that

27   Plaintiff's "level of [mood] symptoms is marked" (AR 28), suggesting such factors

28   may have influenced the test results. She contrasted Dr. Alfano's discussion of

19.

Plaintiff's psychological state with the absence of such discussion in Perrillo's report and faulted Perrillo for the omission.  However, Fiano does not herself opine that psychological factors played a role in results of the Perrillo test; she just faults Perrillo for not describing Plaintiff's test-taking behaviors. (AR 28.)  Fiano also faults Perrillo for not ordering an MRI or other radiological imagery to clarify if there have been white matter changes, for not considering Plaintiff's statement that he had attention problems since childhood, and for not addressing other possible causes for brain changes besides Plaintiff's HIV, such as vascular conditions like hypertension, sleep apnea, drug use, or glaucoma.  (AR 29.)

As to whether the record supports a neurological etiology of Plaintiff's cognitive symptoms (question 8), Fiano responded that there are "multiple potential factors influencing functioning."  She noted that "it is reasonable to conclude that mood symptoms do, to some extent, impact functioning of cognitive symptoms . . . [h]owever, mood symptoms alone are not judged to explain the overall pattern of scores in this case."  (AR 29.)  Plaintiff's scores "would not be explainable by emotional factors alone" and his "profile does not strongly correlate with other specific conditions, but does correlate more highly with neurological etiologies (such as vascular disease, hypertension) than with depression, where there is virtually no correlation."  She also said that while mild to moderate depression would not impact test performance, severe depression could impact test behaviors.  So, she concluded that "a combination of etiologies (neurological and psychological) is considered to have produced the most recent [2014] test data."  (AR 30.)

Finally, as to whether the record shows that other factors like psychological condition, substance abuse, or medications contribute to Plaintiff's cognitive symptoms (question 9), Fiano responded that Plaintiff's "psychological condition plays at least a partially contributing role in overall functioning, including some aspects of cognitive functioning."  (AR 30.)  But she also stated that Plaintiff's "somatic focus [] as well as marked levels of depression and distress . . . cannot

[alone] explain all of the low scores, they would be expected to impact performance

on tasks when the claimant was emotionally liable and less able to sustain focus."

(AR 30.)  She states that this was evident during Dr. Alfano's examination in 2012,

and she also believed such factors influenced Plaintiff's performance on Dr. Perrillo's

exam.  (AR 30.)

## V.    DISCUSSION AND CONCLUSIONS OF LAW[3]

### A. Plaintiff is "Totally Disabled."

As noted above, there is no genuine dispute that Plaintiff's cognitive difficulties

are severe enough to render him totally disabled within the meaning of the Plan, and

the Court so finds.  Plaintiff worked as a talent agent and Head of Commercial

Division at WME.  These positions are very demanding cognitively, requiring

Plaintiff to process, remember, and act on exchanges with clients and their potential

employers, including promoting clients, negotiating their contracts, and managing

their business affairs.  Plaintiff also managed an entire department.  Due to his

compromised cognitive abilities, Plaintiff cannot reliably perform these tasks.

Therefore, Plaintiff is "unable to perform with reasonable continuity the substantial

and material acts necessary to pursue [his] usual occupation" due to "sickness or

injury."  (AR 1797.)  Plaintiff is therefore "totally disabled," as Prudential found.

### B. The Mental Illness Limitation Does Not Apply to Plaintiff's Claim.

The real dispute is whether the mental health limitation applies to Plaintiff's

claim.  The Court finds that it does not.  The starting point of the analysis is the

limitation itself.  The 2009 Certificate describes the limitation as applying to a

disability "due in whole or part to mental illness," and defines depression as a mental

illness.  (AR 1804.)  The question, therefore, is whether Plaintiff's disability is "due in

whole or part to mental illness."   Thus, the Court must interpret that phrase and apply

it to the facts here.

---

[3]  Any finding of fact which is deemed a conclusion of law is incorporated herein by
reference.

### 1.  Interpretation of Mental Illness Limitation

"ERISA does not contain a body of contract law to govern the interpretation and enforcement of employee benefit plans . . . Rather, Congress intended that courts apply contract principles derived from state law but be guided by the policies expressed in ERISA and other federal labor laws." *Richardson v. Pension Plan of Bethlehem Steel Corp.*, 112 F.3d 982, 985 (9th Cir. 1997).  The terms of an ERISA plan should therefore be interpreted "in an ordinary and popular sense," as would be understood by a person of "average intelligence and experience." *Evans v. Safeco Life Ins. Co.*, 916 F.2d 1437, 1441 (9th Cir. 1990) (quoting *Allstate Ins. Co. v. Ellison*, 757 F.2d 1042, 1044 (9th Cir. 1985)).  To resolve disputes that arise from the meaning of a term, courts "first look to the explicit language of the agreement to determine the clear intent of the parties." *McDaniel v. Chevron Corp.*, 203 F.3d 1099, 1110 (9th Cir. 2000).  Further, "[i]n California and in virtually every other jurisdiction in the country, ambiguities in insurance contracts must be construed against the insurer. This rule, known as the doctrine of *contra proferentem*, extends to ERISA policies." *Polnicky v. Liberty Life Assurance Co. of Boston*, 2014 WL 6680725, at *7 (citing *Lang v. LTD Benefit Plan*, 125 F.3d 794, 799 (9th Cir. 1997)).

Here, the meaning of the clause "due in whole or part to mental illness" is not self-evident.  But other courts have construed similar mental illness limitations to require "but-for" causation: that the limitation applies only if a mental health condition is a "but-for" cause of the claimant's disability, such that if the claimant's physical condition would be independently disabling, then the mental health limitation does not apply.  In *Krolnik v. Prudential Ins. Co. of Am.*, 570 F.3d 841 (7th Cir. 2009), the Seventh Circuit addressed a limitation that applies when the disability "is caused even in part by a mental illness." *Krolnik*, 570 F.3d at 842.  The Court stated that "if Krolnik's limitations today are entirely physical (*or if physical problems disable him no matter what his mental state*), then benefits are available under this policy." *Krolnik*, 570 F.3d at 844 (emphasis added).  In *George v. Reliance Standard*

1   *Life Ins. Co.*, 776 F.3d 349 (5th Cir. 2015), the Court construed " 'caused by or

2   contributed to by' . . . to exclude coverage only when the claimant's physical

3   disability was insufficient to render him totally disabled.  In other words . . . [if] the

4   mental disability is a but-for cause of the total disability." *George*, 776 F.3d at 355-

5   356.  In view of the doctrine of *contra preferentum*, and consistent with the above

6   cases, this Court construes the limitation here as applying only if Plaintiff's mental

7   illness was a but-for cause of his disability.

### 2.  Legal Standard for Evaluating Physician Opinions

9         On *de novo* review, the court must resolve conflicting evidence and find facts.

10   As in this case, a claimant's treating physician and the plan's hired medical expert

11   often provide conflicting opinions and courts must determine which opinion to credit.

12   ERISA does not provide district courts with guidance for resolving such conflicts.

13         However, it is well-understood that ERISA does not require a plan

14   administrator to accord greater weight to a claimant's treating physician.  *See*, *e.g.,*

15   *Black & Decker Disability Plan v. Nord*, 538 U.S. 822, 832, 834 (2003) ("[I]f a

16   consultant engaged by a plan may have an 'incentive' to make a finding of 'not

17   disabled,' so a treating physician, in a close case, may favor a finding of 'disabled . . .'

18   [therefore] courts have no warrant to require administrators automatically to accord

19   special weight to the opinions of a claimant's physician").  Otherwise, the cases yield

20   some common-sense guidance for assessing conflicting medical opinion evidence.  In

21   *Shaw v. Life Ins. Co. of N. Am.*, 144 F. Supp. 3d 1114 (C.D. Cal. 2015), the Court

22   succinctly stated them as follows: the "credibility of physicians' opinions turns not

23   only on whether they report subjective complaints or objective medical evidence of

24   disability, but on (1) the extent of the patient's treatment history, (2) the doctor's

25   specialization or lack thereof, and (3) how much detail the doctor provides supporting

26   his or her conclusions." *Shaw* 144 F. Supp. 3d at 1129.

27

28

### 3. Plaintiff's LTD Award Was Not Subject to the Mental Illness Limitation Because Plaintiff's Disability Was Not "Due In Whole Or Part to Mental Illness."

The gravamen of Plaintiff's initial claim for LTD benefits was that his conditions – physical (HIV, osteoporosis) and mental (depression) – were disabling because they made him unable to sustain focus.  (AR 1482.)  Prudential's initial decision, in July 2011, to award Plaintiff LTD benefits based only on his mental health issues (depression, anxiety, and related symptoms) was well-supported by the record: all of Plaintiff's treating physicians (psychiatrist, psychotherapist, internist) referred to his depression diagnoses and found them to be disabling, whereas none of them opined that his physical conditions were disabling.  And, through July 2013 – when Plaintiff's LTD benefit was terminated pursuant to the mental health limitation – the periodic medical evaluations from Plaintiff's treating physicians continued to support the mental health basis of Plaintiff's disability.

The only treating physician to opine that Plaintiff's disability was caused by his physical condition was HIV specialist Dr. Cohan who stated, in his August 2013 letter, that Plaintiff's cognitive functioning was impaired, and that this was "caused and contributed to by his HIV disease, fatigue, chronic pain, and nausea."  (AR 594.) But Dr. Cohan had been treating Plaintiff only since May 2012, well after Plaintiff experienced the problems with cognitive functioning that caused him to seek LTD benefits in April 2011.   Thus, Dr. Cohan treated Plaintiff only since he became disabled, and therefore did not have any first-hand knowledge of Plaintiff's pre-disability condition.  Furthermore, Dr. Cohan had only been treating Plaintiff for sixteen months, and his specialty was not neuropsychology.  Accordingly, the Court does not find Dr. Cohan's letter persuasive and accords it little weight.

The most probative medical evidence consists of Plaintiff's neuropsychological evaluations.  No party disputes the validity of such tests for assessing a person's cognitive abilities, nor has Prudential presented evidence that it is inappropriate to

infer from the results of such tests that a person may have brain damage.  Thus, the
Court concludes that such tests are probative of the question before it.

Here, tests were conducted by Dr. Alfano in July 2012 and Dr. Perrillo in 2014;
in addition, Dr. Fiano reviewed both assessments.  Dr. Alfano concluded that
Plaintiff's disabling cognitive difficulties were caused by his psychological/emotional
impairments, whereas Dr. Perrillo found that they resulted from brain damage caused
by HIV.  The portions of these opinions that are most relevant are those dealing with
Plaintiff's attention, memory, and executive function – the cognitive abilities that
most determine Plaintiff's ability to perform his job as a talent agent and head of
department.

As between these opinions, the Court finds Dr. Alfano's to be less credible and
persuasive, and Dr. Perrillo's moreso.  Dr. Alfano's evaluation rested in significant
part on a faulty foundation: he used outdated tests to establish Plaintiff's estimated
premorbid IQ and measured intellectual ability.  Dr. Perrillo opined that using
outdated tests violates professional standards and that they produce unreliable results,
and cited the American Psychological Ethics Code and guidance from the Social
Security Administration supporting that opinion.  This undermines the overall
credibility of Dr. Alfano's evaluation and opinions.

In addition, some of Dr. Alfano's key conclusions are at odds with the results of
the test he administered.  For example, Plaintiff's pre-morbid cognitive abilities were
estimated to be in the superior range, but Plaintiff scored significantly below the
superior range on six of eight aspects of executive functioning (five aspects were in
the average to high-average range, one aspect was high average, one was high average
to superior, and one was very superior).  Despite Plaintiff scoring below his estimated
"superior" range on 6 out of 8 aspects, Dr. Alfano found that Plaintiff performed
"somewhat at or above expectations."  Thus, Dr. Alfano's assessment of Plaintiff's
executive functioning compared to his pre-morbid level is not supported by Plaintiff's
test results.   Similarly, Plaintiff's scores on verbal and visual learning and memory

25.

1    were almost all below the superior range, yet Dr. Alfano found that Plaintiff was

2    intact.   Perhaps Plaintiff's mostly-average scores suggest that he was "intact" relative

3    to the general population, but they indicate he was impaired relative to his own

4    premorbid superior abilities.

5         Dr. Alfano's other key opinions – including that there is no evidence of

6    cognitive impairment, and that to the extent Plaintiff has cognitive impairments they

7    are caused by his mental health issues – rest in part on the unsupportable premises that

8    Plaintiff's executive function tested "somewhat at or above expectations" and that his

9    verbal and visual learning and memory were intact.   Because these premises are not

10   supported by Plaintiff's test results, Dr. Alfano's conclusions are not persuasive.   To

11   the contrary, the test Alfano administered showed that Plaintiff suffered significant

12   impairments relative to his premorbid abilities, including in executive function and in

13   verbal and visual learning and memory.

14        Dr. Perrillo's assessment is more persuasive.   Perrillo compared Plaintiff's

15   premorbid abilities to his present abilities, and found that Plaintiff experienced deficits

16   across many domains of cognitive function, including attention, executive function,

17   and memory.   This opinion is supported by the underlying test results, such as

18   Plaintiff ranking only in the fifteenth percentile in overall cognitive ability despite

19   having a predicted baseline of superior/very superior that should have yielded results

20   in the 91%-95% range.   (AR 139, 145.)   Dr. Perrillo found that Plaintiff was

21   completely disabled by his cognitive impairments.   Perrillo stated that Plaintiff's test

22   results show that Plaintiff experienced brain damage, including white matter changes

23   and prefrontal, frontal, temporal, occipital, and motor impairments, that are most

24   likely attributable to Plaintiff's HIV disease. (AR 157-158.)   He also stated that

25   research has shown that depression and anxiety do not have a significant effect on

26   neuropsychological test results.   Importantly, Perrillo quoted substantial scholarly

27   literature establishing that HIV can cause brain damage resulting in cognitive decline,

28   particularly in the domains of motor function, executive function, attention and visual

26.

memory.  Notably, both of the neuropsychological evaluations Plaintiff underwent showed deficits in many of these domains.  In short, Dr. Perrillo's opinion that Plaintiff suffered cognitive deficits caused by brain damage attributable to HIV cognitive decline are well-matched with the underlying test results and well-supported by the scholarly literature.

Dr. Fiano reviewed Plaintiff's entire file and, most importantly, both of the neuropsychological reports.  Dr. Fiano takes issue with Dr. Perrillo's report, but only at the margins.  For example, she faults Perrillo for not addressing the impact Plaintiff's psychological status or mood might have had on the evaluation, but Perrillo actually does address this, stating that psychological factors did not come into play because the test validation measures showed Plaintiff applied optimal effort, and that he did not have any kind of severe personality disorder that could complicate the interpretation of the results.  (AR 157.)

But, overall, Fiano largely concurs that Plaintiff's disability has a physical basis.  For example, she states that Plaintiff has disabling cognitive impairments "with at least some component being related to neurological or organic factors including his HIV status, associated treatment, and other conditions that would impact the integrity of white matter and the vascular system."  (AR 26.)   She also stated that mood symptoms would not account for the pattern of Plaintiff's scores, and that his profile correlates more highly with neurological etiologies than with depression, where there is virtually no correlation.  (AR 30.)  Fiano stated that Plaintiff's psychological condition plays *some* role in his cognitive functioning, but she did not address the degree to which psychological factors caused his disability.

Synthesizing all of the foregoing, Plaintiff's two neuropsychological evaluations show that he suffered disabling cognitive impairments that have a physical etiology.  These impairments are not attributable to mental health issues.  For many years until 2011, Plaintiff coped with major depression and functioned at a very high cognitive level.  By 2011, he complained of cognitive deficits, along with other

1   physical and psychological problems.  At the time, Plaintiff's doctors focused on

2   Plaintiff's familiar, long-standing history of depression – and rightly so, as that

3   appeared to be the cause of his most acute distress – and, accordingly, their reports to

4   Prudential established a mental health basis for his disability.

5         Significantly, the extent of Plaintiff's reported cognitive deficits could not be

6   established by the doctors he was already seeing; he needed neuropsychological

7   evaluations for that.  Dr. Osinubi stated as much in March 2012, opining that

8   Plaintiff's medical records did not establish that he had a disabling physical condition,

9   and noting that neuropsychological testing would be necessary to better evaluate

10  Plaintiff's cognitive difficulties.  (AR 1693-94.)

11        The two neuropsychological tests that followed establish that Plaintiff suffered

12  cognitive deficits that are not attributable to his psychological condition but instead

13  have a physiological etiology.  Both Drs. Perrillo and Fiano opined that the tests show

14  that Plaintiff suffered brain damage, in particular, damage to his brain's white matter

15  most likely caused by HIV.  Furthermore, both stated that psychological factors do not

16  influence the results of neuropsychological testing, and there is no dispute that both

17  tests were demonstrated to be valid – that is, Plaintiff wasn't malingering, giving poor

18  effort, or otherwise performing so as to manipulate the tests.  Accordingly, Plaintiff's

19  psychological condition did not cause the disabling deficits reflected on those tests.

20  Consistent with the opinions of Drs. Perrillo and Fiano, the Court finds that brain

21  damage stemming from HIV is the most likely cause of Plaintiff's disabling cognitive

22  deficiencies.

23        The Court also finds that brain damage stemming from HIV is the but-for cause

24  of Plaintiff's disability.  Plaintiff experienced severe depression for decades and

25  functioned at a high level despite it.  Then, in 2011, Plaintiff began complaining of the

26  cognitive difficulties that disabled him.  It is true that Plaintiff also suffered a serious

27  mental health breakdown at around the same time.  But the medical evidence

28  establishes that Plaintiff's decades-long battle with depression and his 2011 onset of

1    disabling cognitive difficulties are different conditions.   Given that Plaintiff
2    functioned at a high level for decades despite his severe depression, and that he could
3    not function at that level only once his cognitive impairments set in, the Court finds
4    that Plaintiff's cognitive deficits are the but-for cause of his disability.  If Plaintiff's
5    mental health issues were suddenly resolved, he would still suffer from the cognitive
6    impairments that disable him.

7         Because Plaintiff's physical condition (brain damage caused by HIV) is the but-
8    for cause of his disabling cognitive impairments, his disability is not "due in whole or
9    part to mental illness."  Therefore, the mental illness limitation does not apply, and
10   Prudential wrongfully terminated Plaintiff's LTD benefits.

11        The Court rejects Prudential's argument that Plaintiff should have objected to
12   the mental health basis of his award at the outset, when Prudential made that finding.
13   Plaintiff could not have appealed at that time because Prudential's decision to award
14   him benefits was not an "adverse benefit determination," meaning "a denial, reduction
15   or termination of . . . a benefit," 29 C.F.R. § 2560.503–1(m)(4), that would trigger the
16   right to appeal.

17        Nor is the Court persuaded that a physiological basis of Plaintiff's disability
18   developed only after his LTD benefit was terminated and he was no longer eligible for
19   coverage.   Plaintiff complained of disabling cognitive impairments with his initial
20   claim, and Dr. Alfano's neurological examination, which took place while Plaintiff
21   was still receiving LTD, reflected significant cognitive impairments.  The extent,
22   nature, and cause of Plaintiff's disabling cognitive impairments were not diagnosed
23   until after his LTD benefits were terminated, but the record indicates that those
24   impairments were present all along.

25        In conclusion, Plaintiff has established that he is disabled under the terms of the
26   Plan and that Prudential incorrectly relied on the Plan's mental illness limitation to
27   terminate his benefits.

28

## VI.   CONCLUSION

For the foregoing reasons, the Court finds in favor of Plaintiff John Doe and against Defendant Prudential.  Plaintiff is entitled to all of the declaratory and injunctive relief sought in the Complaint.  In particular, the Court

(1) **DECLARES** that Prudential violated the terms of the Plan by denying Plaintiff's claim for disability benefits;

(2) **ORDERS** Prudential and the Plan to pay Plaintiff's disability benefits owed under the terms of the Plan from July 10, 2013, through to the date that judgment is rendered herein, together with prejudgment interest on each and every such payment through to the date that judgment is rendered herein;

(3) **DECLARES** that Plaintiff is entitled to receive future monthly disability benefit payments under the terms of the Plan; and

(4) **ORDERS** Prudential to issue monthly benefit payments until Plaintiff reaches the maximum benefit duration without subjecting Plaintiff to further claims procedures with respect to his claim for benefits under the Plan.

The parties are **ORDERED** to meet and confer on any remaining issues, including the additional elements in Plaintiff's prayer for relief.  If the parties can agree on the remaining issues, Plaintiff must submit a Proposed Judgment within ten (10) days of this order.

If the parties require court intervention to resolve any remaining issues, the parties shall submit a Joint Report within ten (10) days of the issuance of this order, explaining the nature of their remaining disputes and proposing an appropriate schedule for resolving them.

**IT IS SO ORDERED.**

Dated:  March 27, 2017   _____

HONORABLE ANDRÉ BIROTTE JR.
UNITED STATES DISTRICT COURT JUDGE

30.